### Reilly v. Ernst & Young LLP

C.P. of Butler County, no. AD 97-10022.

*Richard DiSalle, Victor H. Pribanic, David L. Cook, Thomas King III* and *Douglas G. Linn II,* for plaintiffs.

*Samuel W. Braver, P. Jerome Richey, Lee A. Montgomery, Kristi A. Davidson* and *Stanley J. Parker,* for defendants.

YEAGER, *J.,* November 19, 2003—The present action was commenced on January 8, 1997, by the plaintiffs, Barbara L. Reilly and Thomas Reilly, against the defendant, Ernst & Young LLP, successor to Arthur Young and Company and Charles Modispacher with the filing of a complaint in civil action. This complaint was later amended by the plaintiffs on January 13, 1999. The amended complaint sets forth the following claims against Ernst & Young LLP:

Count I: Barbara Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—negligence

Count II: Thomas Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—negligence

Count III: Barbara Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—civil conspiracy

Count IV: Thomas Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—civil conspiracy

Count V: Barbara Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—fraudulent misrepresentation

Count VI: Thomas Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—fraudulent misrepresentation

Additionally, the parties in the case now before this court have agreed to a non-jury trial.[1] As such, the court's responsibilities in this instance are significantly different than if a jury were charged with the duty of reviewing the evidence and reaching a verdict in this matter.

The courts of this Commonwealth have addressed the role of the trial court in a non-jury trial. In *C.W. v. K.A.W.*, 774 A.2d 745, 749 (Pa. Super. 2001), the Superior Court held, "In a non-jury trial . . . the role of the judge is to interpret the law, determine the facts and apply the facts to the law for an eventual decision of the controversy." Further, the Commonwealth Court in *Allegheny Ludlum Corp. v. Municipal Authority of Westmoreland County*, 659 A.2d 20, 30 (Pa. Commw. 1995), stated, "[I]t is within the province of the trial court when acting as fact-finder

---

1. A non-jury trial was held before this court from September 30, 2002, to October 10, 2002, and June 25, 2003.

to weigh conflicting testimony, determine credibility and resolve conflicts in the evidence." Therefore, it is this court's responsibility to assess the evidence presented, discern relevant facts, and apply the appropriate laws of this Commonwealth.

Specifically, this court must review the evidence and determine if the plaintiffs successfully fulfilled their obligation to sufficiently prove the essential elements of each of the counts stated *supra*. In this instance, the plaintiffs' amended complaint contains six separate counts. Accordingly, this court must make findings of fact and arrive at conclusions of law on each respective cause of action in the plaintiffs' amended complaint. After consideration of all of the evidence presented in this case, the court makes the following findings of fact:

## FINDINGS OF FACT

(1) The plaintiffs, Barbara L. Reilly and Thomas Reilly, are adult residents of Butler County, Pennsylvania.

(2) The plaintiffs, Barbara L. Reilly and Thomas Reilly, are husband and wife. (Trial testimony of Reilly, Thomas.)

(3) Canterbury Village Inc. was a Pennsylvania corporation involved in both the ownership and development of the Seven Fields development located in Butler County. (Trial testimony of Reilly, Thomas.)

(4) The plaintiffs, Barbara L. Reilly and Thomas Reilly, are the former owners of 50 percent of the stock of Canterbury Village Inc. as tenants by the entireties. (Trial testimony of Reilly, Thomas.)

(5) As of May 1986, Barbara L. Reilly and Thomas Reilly had a 50 percent ownership in Canterbury Village Inc. (Trial testimony of Reilly, Thomas.)

(6) The defendant, Ernst & Young LLP, is a certified public accounting firm, and is successor to Arthur Young & Company.[2] (Trial testimony of Modispacher, Charles.)

(7) Charles Modispacher is a certified public accountant licensed under the CPA law of 1976, formerly an employee of Arthur Young & Company, was an employee of its successor, Ernst & Young LLP, and all times relevant to this action, was an authorized agent of defendant and its predecessor. (Trial testimony of Modispacher, Charles.)

(8) Charles Modispacher was asked to resign from Ernst & Young in 1993 due to the firm's effort to downsize. (Trial testimony of Modispacher, Charles.)

(9) Charles Modispacher presently is employed as the director of development at Stokes and Henry. (Trial testimony of Modispacher, Charles.)

(10) The defendant, Ernst & Young, through its successor in interest, performed accounting services for the corporation, Canterbury Village Inc. (Trial testimony of Modispacher, Charles.)

(11) Ernst & Young began their work for Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. in May 1986. (Trial testimony of Modispacher, Charles.)

(12) From May 14, 1986 to June 3, 1986, there was an understanding between Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc., Managed Properties Inc. and the defendant regarding their responsibilities and functions. (Trial testimony of Modispacher, Charles.)

---

2. Ernst & Young LLP was formed as a successor to Arthur Young & Company in 1989. For the purposes of this opinion, this court identifies Ernst & Young LLP as the actor for the conduct of both Arthur Young & Company and Ernst & Young LLP.

(13) After June 3, 1986, the bankruptcy court directed the work of the defendant regarding Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Trial testimony of Modispacher, Charles.)

(14) Charles Modispacher stated that Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. were his clients. (Trial testimony of Modispacher, Charles.)

(15) Ernst & Young took control of the records of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Trial testimony of Modispacher, Charles.)

(16) Charles Modispacher indicated that Ernst & Young did more than a compilation of the records of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Trial testimony of Modispacher, Charles.)

(17) Ernst & Young gave opinions regarding the financial statements of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc., Managed Properties Inc. and testimony in the bankruptcy court. (Trial testimony of Modispacher, Charles.)

(18) Ernst & Young gave information to attorneys to prepare the bankruptcy petitions. (Trial testimony of Modispacher, Charles.)

(19) Charles Modispacher testified that he never talked with the plaintiffs prior to the bankruptcy proceedings. (Trial testimony of Modispacher, Charles.)

(20) Charles Modispacher failed to do a title search of these properties. (Trial testimony of Modispacher, Charles.)

(21) Charles Modispacher stated that no one from Ernst & Young ever reviewed the books of Canterbury Village Inc., nor did they speak with Barbara L. Reilly and Thomas Reilly prior to the bankruptcy proceedings. (Trial testimony of Modispacher, Charles.)

(22) Charles Modispacher stated that the $69,000,000 debt shown on the Canterbury Village Inc. voluntary bankruptcy petition was improperly attributed to Canterbury Village Inc. (Trial testimony of Modispacher, Charles.)

(23) A figure of $69,000,000 in liabilities was not on the books of any of the four corporations. (Trial testimony of Modispacher, Charles.)

(24) Charles Modispacher testified that the bankruptcy schedule was inaccurate. (Trial testimony of Modispacher, Charles.)

(25) Charles Modispacher read the bankruptcy petition but did not focus on the petition. (Trial testimony of Modispacher, Charles.)

(26) Charles Modispacher knew that the bankruptcy petition was false on June 3, 1986 and did not tell Frank Gustine (the individual hired as the new general manager of the four corporations) that the information was false. (Trial testimony of Modispacher, Charles.)

(27) Regarding Earned Capital Corporation Inc., Ernst & Young did not determine if the liability showing on the bankruptcy petition was debt or equity. (Trial testimony of Modispacher, Charles.)

(28) A consolidated bankruptcy petition for Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. was filed. (Trial testimony of Modispacher, Charles.)

(29) The bankruptcy petition showed land cost, however, Ernst & Young had no idea of the value of the land. (Trial testimony of Modispacher, Charles.)

(30) According to the application for approval of employment of accountants, Ernst & Young was hired to compile information concerning the debtors for the purpose of preparing the debtor's statement of affairs and schedule of assets and liabilities. (Trial testimony of Modispacher, Charles.)

(31) Paragraph 3 of the application for approval of employment states in pertinent part:

"The debtors wish to employ the firm of Arthur Young & Company to perform all accounting services for the debtors which may be necessary, with the most immediate services being to assemble and review the debtors' books and records and to compile relevant financial information concerning the debtors—or the—file relevant information concerning the debtors for the purpose of preparing the debtors' statements of affairs and schedules of assets and liabilities." (Trial testimony of Mark Gallagher.)

(32) This application entails more than a mere compilation. (Trial testimony of Mark Gallagher, an expert witness for the plaintiff.)

(33) Ernst & Young and Charles Modispacher are members of the American Institute of Certified Public Accountants (AICPA). (Trial testimony of Modispacher, Charles.)

(34) Charles Modispacher indicated that Ernst & Young follows generally accepted auditing standards (GAAS). (Trial testimony of Modispacher, Charles.)

(35) GAAS establish rules of professional responsibility for certified public accountants. (Trial testimony of Modispacher, Charles.)

(36) The AICPA professional standards establish rules of professional responsibility for certified public accountants. (Trial testimony of Mark Gallagher.)

(37) AICPA professional standards, ET section 102, Integrity and objectivity, states in pertinent part:

"In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent the facts or subordinate his or her judgment to others. A member shall be considered to have knowingly misrepresented facts in violation of Rule 102 [ET section 102.01] when he or she knowingly—

"(1) Makes or permits or directs another to make materially false and misleading entries in an entity's financial statements or records shall be considered to have knowingly misrepresented facts in violation of Rule 102 [ET section 102.01]; or

"(2) Fails to correct an entity's financial statements or records that are materially false and misleading when he or she has the authority to record an entry; or

"(3) Signs or permits or directs another to sign a document containing false and misleading information."

(38) AICPA professional standards, ET section 501-4 states in pertinent part:

"A member shall be considered to have committed an act discreditable to the profession in violation of Rule 501 [ET section 501.01] when, by virtue of his negligence, such member—

"(1) Makes or permits or directs another to make, materially false and misleading entries in the financial statement or records of an entity; or

"(2) Fails to correct an entity's financial statements that are materially false and misleading when the member has the authority to record an entry; or

"(3) Signs or permits or directs another to sign a document containing materially false and misleading information."

(39) AICPA AU section 150, GAAS, states in pertinent part:

*"Standards of field work*

".02(3) Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."

(40) AICPA AU section 230, states in pertinent part:

".01 Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

".02 This standard requires the independent auditor to plan and perform his work with due professional care. Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of fieldwork and reporting.

".03 *Cooley on Torts,* a legal treatise, describes the obligations for due care as follows: every man who offers his services to another and is employed assumes the duty to exercise in the employment such skill as he possesses with reasonable care and diligence. In all these employments where peculiar skills is requisite, if one offers his services, he is understood as holding himself out to the public as possessing the degree of skill commonly possessed by others in the same employment, and if his pretensions are unfounded, he commits a species

of fraud upon every man who employs him in reliance upon his public profession."

(41) The defendant violated AICPA AU section 230. (Trial testimony of Modispacher, Charles.)

(42) AU section 230: Reasonable assurance (.10)

"The exercise of due professional care allows the auditor to obtain *reasonable assurance* that financial statements are free of material misstatements, whether caused by error or fraud."

(43) ET: section 56, article V

"The quest for excellence is the essence of due care. Due care requires a member to discharge his professional responsibility with competence and diligence. It imposes the obligation to perform professional services to the best of a member's ability with concern for the best interest of those for whom the services are performed and consistent with the profession's responsibility to the public."

(44) Permitting the filing of false bankruptcy petitions is a violation of AICPA professional standards, ET section 102. (Trial testimony of Modispacher, Charles.)

(45) Charles Modispacher stated that he was negligent in allowing false bankruptcy petitions to be filed and was indifferent to the effect on Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc., Managed Properties Inc. and the shareholders. (Trial testimony of Modispacher, Charles.)

(46) Permitting false information to remain on a bankruptcy petition is a violation of AICPA professional standards, ET section 501-4. (Trial testimony of Modispacher, Charles.)

(47) Failure to correct false information on a bankruptcy petition is a violation of the AICPA standards of

professional conduct. (Trial testimony of Mark Gallagher.)

(48) The filing of the false bankruptcy petitions led to the Reillys losing their real property and CVI. (Trial testimony of Mark Gallagher.)

(49) The general standards of Rule 102 apply to both audits and compilations. (Trial testimony of Mark Gallagher.)

(50) The defendant was responsible for filing a bankruptcy petition in the matter of the solvency of Canterbury Village Inc. and Eastern Arabians Inc. (Deemed admission no. 1.)

(51) As of the time of filing the foregoing bankruptcy petition, the defendant did not have an appraisal of any sort that established the reasonable fair market value of the real property that was among the assets of Canterbury Village Inc. and Eastern Arabians Inc. (Deemed admission no. 2.)

(52) During the pendency of the bankruptcy, the defendant became aware that there was at least one appraisal that valued the property owned by Canterbury Village Inc. at a value of $70,000,000. (Deemed admission no. 3.)

(53) After becoming aware of the existence of an appraisal that described the value of the real property as $70,000,000, the defendant took no action to investigate its veracity or otherwise withdraw or modify the court proceedings to take into account the real property's true value. (Deemed admission no. 4.)

(54) The defendant did not receive any records relative to the corporate affairs or value of Canterbury Village Inc. until July 1986. (Deemed admission no. 5.)

(55) Bankruptcy petitions were filed in the case of Canterbury Village Inc. and Eastern Arabians Inc. in June of 1986. (Deemed admission no. 6.)

(56) The defendant was aware of but did not take into account appraisals that had been performed by independent appraisers at the request of lenders that valued the real property of Canterbury Village Inc. at a substantially higher value than that set forth in the bankruptcy petitions filed by the defendant. (Deemed admission no. 7.)

(57) The defendant was aware that the commencement of a bankruptcy proceeding in respect to the affairs of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. would result in persons who had invested funds in these four corporations believing that they had substantially lost all of their investment as a result of the bankruptcy proceedings. (Deemed admission no. 8.)

(58) The defendant was aware that the commencement of a bankruptcy proceeding in respect to the affairs of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. would result in a criminal investigation and likely prosecution of Thomas Reilly. (Deemed admission no. 9.)

(59) Prior to the commencement of the bankruptcy proceedings in respect to Canterbury Village Inc. and Eastern Arabians Inc., the defendant never discussed the affairs, solvency, or other matters related to these corporations with any officers or shareholders of the corporations. (Deemed admission no. 10.)

(60) The defendant, as of December 15, 1999, was unaware what a Chapter 13 Bankruptcy filing was. (Deemed admission no. 11.)

(61) As of the commencement of the bankruptcy proceedings in respect to the affairs of Canterbury Village

Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc., that the defendant did not know the nature of the proceeding that it had commenced. (Deemed admission no. 12.)

(62) In neither 1995 nor 1999, the defendant was unaware that the bankruptcy definition of solvency relates to assets as compared to liabilities, or the ability to pay debts as they become due. (Deemed admission no. 13.)

(63) As of the commencement of the bankruptcy petitions filed by the defendant that Canterbury Village Inc. was not insolvent based upon solvency being defined as assets exceeding or equaling liabilities. (Deemed admission no. 14.)

(64) As of the commencement of the bankruptcy petitions filed the defendant, Eastern Arabians Inc., was not insolvent based upon solvency being defined as assets exceeding or equaling liabilities. (Deemed admission no. 15.)

(65) As of the commencement of the bankruptcy petitions filed, the defendant, Earned Capital Corporation Inc., was not insolvent based upon solvency being defined as assets exceeding or equaling liabilities. (Deemed admission no. 16.)

(66) As of the commencement of the bankruptcy petitions filed, the defendant, Managed Properties Inc., was not insolvent based upon solvency being defined as assets exceeding or equaling liabilities. (Deemed admission no. 17.)

(67) The defendant did as directed by Frank Gustine during the course of the defendant's services as an accountant from May 1986 through October 1987. (Deemed admission no. 21.)

(68) The defendant did as directed by Anthony Picadio during the course of the defendant's services as an ac-

countant from October 1987 through August 1995. (Deemed admission no. 22.)

(69) The appraisal that the defendant relied upon was prepared by Omni Appraisal. (Deemed admission no. 23.)

(70) Omni Appraisal was a subsidiary of and owned by Oliver Realty. (Deemed admission no. 24.)

(71) Frank Gustine was at the time of the appraisal submitted by Omni Appraisal a former vice-president of and head of the commercial division of Oliver Realty, and had used Omni Appraisal on numerous occasions in the past. (Deemed admission no. 25.)

(72) The defendant knew prior to the commencement of the bankruptcy and prior to defendant's reliance upon the appraisal, that Frank Gustine had an interest in purchasing the real property owned by Canterbury Village Inc., and/or Earned Capital Corporation Inc. (Deemed admission no. 26.)

(73) The order of court under date of May 20, 1992, valued the stock based upon appraisals and other evidence that stated the property value of 1986. (Deemed admission no. 32.)

(74) As of 1986, the real property owned by Canterbury Village Inc. had a value of not less than $68,000,000. (Deemed admission no. 33.)

(75) As a result of the bankruptcy petition filed, Canterbury Village Inc. was deprived of all of the assets that it owned prior to the commencement of the bankruptcy including one-half of the real property that later was owned by Seven Fields Development Corporation. (Deemed admission no. 34.)

(76) Thomas and Barbara Reilly executed options to purchase one-half of the real property owned by Canter-

bury Village Inc., later owned by Seven Fields Development Corporation, as follows:

(i) Deed for 275 acres with option dated February 15, 1985.

(ii) Deed for 35 acres with option dated January 6, 1985.

(iii) Deed for 300 acres with option dated May 15, 1984.

(iv) 24 townhouse units with option agreement.

(v) 50 townhouse units with option agreement. (Deemed admission no. 35.)

(77) As a result of the filing of the bankruptcy petition, Thomas and Barbara Reilly were deprived of the value of the real property that had a value of at least $68,000,000, as of May 20, 1992. (Deemed admission no. 36.)

(78) Thomas and Barbara Reilly relied upon Ernst & Young to do an accurate and correct assessment of the assets and liabilities of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Testimony of Reilly, T.)

(79) Thomas and Barbara Reilly believed that Ernst & Young would truthfully file any necessary bankruptcy petitions and determine the solvency of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Testimony of Reilly, T.)

(80) Thomas Reilly was convicted of income tax fraud and mail fraud. (Testimony of Reilly, T.)

(81) Earned Capital Corporation oversold buildings and land at the Seven Fields property. (Trial testimony of Hrkman, Nicholas).

(82) Actual model home units, not interest in model home units, at the Seven Fields property were the subject of this overselling. (Trial testimony of Hrkman, Nicholas).

(83) In the spring of 1984, Nick Hrkman told Thomas Reilly that there was overselling of units on the Seven Fields property. (Trial testimony of Hrkman, Nicholas).

(84) In May 1986, Earned Capital Corporation Inc. stopped selling interest in the Seven Fields real estate. (Trial testimony of Krall, Edward G.)

(85) Without the sale of these units by Earned Capital Corporation Inc., there were no other monies to cover payments to investors. (Trial testimony of Krall, Edward G.)

(86) To pay off the old investors, monies were taken from the new investments. (Trial testimony of Krall, Edward G.)

(87) Frank Gustine verified the bankruptcy petitions. (Trial testimony of Modispacher, Charles.)

(88) James Hart is a partner in Ernst & Young. (Trial testimony of James Hart.)

(89) James Hart stated that the net worth of Ernst & Young, as of June 28, 2002, was $374,000,000. (Trial testimony of James Hart.)

(90) Barbara L. Reilly did not testify in the present case.

(91) Both parties in this matter consented to not have Barbara L. Reilly testify.

(92) Portions of Barbara L. Reilly's deposition from August 9, 2001, were read into the record.

(93) Barbara Reilly was kept "out of the loop" when Earned Capital Corporation Inc. stopped selling investments. (Deposition testimony of Reilly, Barbara L.)

(94) Barbara L. Reilly served as secretary of Canterbury Village Inc. (Deposition testimony of Reilly, Barbara L.)

(95) Barbara L. Reilly did not recall any specific conversations regarding the bankruptcies of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Deposition testimony of Reilly, Barbara L.)

## NEGLIGENCE

In reaching a decision in the present matter, this court considers Counts I and II of the plaintiffs' amended complaint, concurrently. Counts I and II of the plaintiffs' amended complaint are stated as follows:

Count I: Barbara Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher[3]—negligence

Count II: Thomas Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—negligence

Therefore, this court first examines the plaintiffs' claims for negligence against the defendant. As noted *supra,* whereas the parties have agreed to a non-jury trial, it is this court's responsibility to review the evidence, apply the appropriate laws of this Commonwealth, and determine if the plaintiffs have successfully fulfilled their obligation to prove a cause of action in negligence.

According to the courts of this Commonwealth, to prove a cause of action in negligence, a plaintiff must

---

3. As stipulated by the parties and their respective counsel, Charles Modispacher was discontinued from the present action with prejudice on June 3, 2002.

demonstrate by a preponderance of the evidence the negligence of the defendant. Specifically, the Supreme Court of Pennsylvania in *Good v. City of Pittsburgh,* 382 Pa. 255, 260, 114 A.2d 101 (1955), held, "The plaintiff in a negligence action, of course, has the burden of establishing by a preponderance of the evidence the fault of the defendant as the proximate cause of the injury in suit." Therefore, this court must determine if the plaintiffs, by a preponderance of the evidence, have sufficiently proved their claims for negligence.

As such, this court begins its analysis of the plaintiffs' claims by reviewing those elements the courts have held are essential to establishing a cause of action for negligence. Addressing this issue, the Supreme Court of Pennsylvania in *Atcovitz v. Gulph Mills Tennis Club Inc.,* 571 Pa. 580, 586, 812 A.2d 1218, 1222 (2002), held that to successfully establish a claim for an action in negligence, a plaintiff must show: (1) the existence of a duty or obligation recognized by law, requiring the actor to conform to a certain standard of conduct; (2) a failure on the part of the defendant to conform to that duty, or a breach thereof; (3) a causal connection between the defendant's breach and the resulting injury; and (4) actual loss or damage suffered by the complainant. Further, to succeed in a cause of action in negligence, the burden is placed upon a plaintiff to show, by a preponderance of the evidence, that each of these elements has been satisfied.

After careful application of the *Atcovitz* test to the instant matter, this court holds that these plaintiffs demonstrated, by a preponderance of the evidence, the negligence of the defendant. To reach this conclusion, the court considers each of the four (4) elements identified by the *Atcovitz* court as essential to a claim for negligence.

## A. *Application of the Pennsylvania Supreme Court Test for Negligence*

### 1. The Existence of a Duty or Obligation Recognized by Law, Requiring the Actor To Conform to a Certain Standard of Conduct

The court in *Atcovitz* held that in a claim for negligence, a plaintiff must demonstrate that there existed a duty or obligation recognized by law requiring a defendant to conform to a given standard. To this extent, the failure by a plaintiff to establish a legal duty owed by a defendant will necessarily result in the failure of a plaintiff's negligence claim. Indeed, the Supreme Court of Pennsylvania has held that the most significant element in a claim for negligence is duty. See *Althaus v. Cohen,* 562 Pa. 455, 547, 552, 756 A.2d 1166, 1169 (2000). Constructing a paradigm by which Pennsylvania courts are to determine the existence of duty, the Supreme Court held:

"The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." See *id.*

Additionally, the *Althaus* court stated that the concept of a legal duty of care necessarily includes the consideration of a variety of public policy concerns, including history, morals, justice, and society. See *id.* Applying this standard to the circumstances of the present case, this court finds that the defendant had a duty to the plaintiffs.

In arriving at this conclusion, the court first examines the relationship between the parties. The defendant asserts that there is no privity between the plaintiffs and the defendant. Rather, the defendant argues that privity existed only between the defendant and Canterbury Village Inc., and any litigation in this matter should have been initiated by the entity CVI. This court disagrees. After reviewing related decisions by the courts of this Commonwealth, this court holds that privity is not required under these circumstances.

For guidance, this court considers the decision by the U.S. District Court in *In re Intelligent Electronics Inc., Securities Litigation* (E.D. Pa. 2001), denying a defendant's motion to dismiss a plaintiff's complaint. In this instance, the U.S. District Court held that, whereas securities holders were the intended beneficiaries of the audits completed by the accounting firm Price Waterhouse, privity was not required. Reviewing a claim for negligent misrepresentation under Restatement (Second) Torts §552, the *Intelligent* court held that where an accounting firm prepares reports upon which investors or shareholders rely, the accounting firm can be held liable to the individual shareholders. Further, the court stated that shareholders may maintain a cause of action against an accounting firm when those shareholders are intended beneficiaries of the information provided by the accounting firm. Therefore, the U.S. District Court concluded, "that Pennsylvania law does not require privity to maintain a negligent misrepresentation action against an accounting firm." See *id.*

In the present case, however, the plaintiffs have not alleged a claim for negligent misrepresentation. Rather, the plaintiffs in their amended complaint assert that the

defendant acted negligently. A comparison of these two causes of action, negligent misrepresentation and negligence, indicates differences in those elements essential to the establishment of these respective claims. According to the courts, the following elements are required to successfully establish a cause of action in negligent misrepresentation:

"(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." See *Bortz v. Noon,* 556 Pa. 489, 500, 729 A.2d 555, 561 (1999).

Further, as noted *supra,* the courts have held that the elements for a negligence claim include:

"(1) [T]he existence of a duty or obligation recognized by law, requiring the actor to conform to a certain standard of conduct; (2) a failure on the part of the defendant to conform to that duty, or a breach thereof; (3) a causal connection between the defendant's breach and the resulting injury; and (4) actual loss or damage suffered by the complainant."

After reviewing the standards for these two causes of action, it is clear that in both instances, a plaintiff must establish a legal duty or obligation owed by the defendant to the plaintiff. "[L]ike any action in negligence, there must be an existence of a duty owed by one party to another." *Id.,* citing *Gibbs v. Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994).

To this extent, although those elements essential for the claim of negligent misrepresentation in *Intelligent* differ from the essential elements of the negligence claim

in the present case, the requirement of duty remains a constant. As such, this court holds that the duty requirement imposed in *Intelligent* can be applied in the present case. Specifically, this court holds that in both instances shareholders were intended beneficiaries of the information provided by the accounting firm. Further, this court finds that as intended beneficiaries, the plaintiffs had a distinct and identifiable relationship with the defendant that deserves protection. Accordingly, this court holds that this *relationship* between the plaintiffs and the defendant in the present case sufficiently satisfies the first factor in determining duty as provided by the Supreme Court of Pennsylvania in *Althaus.*

This court next must assess the social utility of imposing a duty upon the defendant in the present matter. According to the Pennsylvania Supreme Court in *Althaus,* before imposing a duty upon a defendant, a court shall determine the social impact and value of the duty. To this extent, a court must take great care when imposing a duty to ensure that its social utility is not disfavored. See *Althaus* at 1170. Therefore, in determining if the defendant owed a duty to the plaintiffs in the instant case, this court considers the role and responsibilities that accountants and accounting firms maintain in society and the social utility of imposing this duty upon the defendant.

The services of accounting firms are utilized for a variety of reasons, including the review of financial records and the providing of accurate and reliable information. Further, it has become increasingly clear over the past few years, the significant role that accounting firms play in the decision-making processes of business. These services are highly specialized, and are often used to make important financial decisions. Unfortunately, acts by

these same accounting firms have resulted in poor business decisions, subsequently leading to significant financial loss by many. Consequently, this court holds that accounting firms have a duty to act in a responsible manner and maintain constant consideration of those that are intended beneficiaries of their work. For this court to find otherwise would be to establish a dangerous precedent by which accounting firms could escape liability for their tortious acts.

In the instant matter, the court finds that the plaintiffs were intended beneficiaries of the defendant's accounting services. Further, this court cannot conceive of any reason that social utility would disfavor the imposition of a duty on the defendant in the present matter. Although the defendant argues to the contrary, no argument was presented before this court that persuades this court to limit the duty and liability of the defendant under these circumstances.

There is nothing in the present case that would convince this court that protecting the defendant from liability in this case is necessary or required for the promotion of social utility. Also, this court finds that, as intended beneficiaries, the defendant owed a duty to the plaintiffs to provide reliable and accurate accounting services. Moreover, the court finds that the imposition of this duty by the court does not negatively impact social utility as discussed by the Supreme Court in *Althaus*. Therefore, after weighing the social utility of shielding the defendant from liability against protecting the plaintiffs from the negligent acts of the defendant, this court concludes that the defendant owed a duty to these plaintiffs.

To determine if duty exists in the present case, the court next considers prong three of the *Althaus* test. Accord-

ing to the Supreme Court in *Althaus,* before duty can be assessed in a negligence case, a court must assess the nature of the risk imposed and foreseeability of the harm incurred. Thus, this court must determine if the defendant either created or could reasonably foresee the possibility that its actions would result in harm to the plaintiffs. After reviewing the evidence presented before this court, it is clear that the actions of the defendant created the substantial harm that eventuated. Such evidence includes:

Charles Modispacher is a certified public accountant licensed under the CPA law of 1976, was formerly an employee of Arthur Young & Company, was an employee of its successor, Ernst & Young LLP, and all times relevant to this action, was an authorized agent of defendant and its predecessor. (Trial testimony of Modispacher, Charles.)

The defendant, Ernst & Young, the successor to Arthur Young & Company, performed accounting services for the corporation, Canterbury Village Inc. (Trial testimony of Modispacher, Charles.)

Charles Modispacher stated that Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. were his clients. (Trial testimony of Modispacher, Charles.)

Ernst & Young took control of the records of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Trial testimony of Modispacher, Charles.)

Charles Modispacher indicated that Ernst & Young did more than a compilation of the records of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Cor-

poration Inc. and Managed Properties Inc. (Trial testimony of Modispacher, Charles.)

Ernst & Young gave opinions regarding the financial statements of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc., Managed Properties Inc. and testimony in the bankruptcy court. (Trial testimony of Modispacher, Charles.)

Ernst & Young gave information to attorneys to prepare the bankruptcy petitions. (Trial testimony of Modispacher, Charles.)

Charles Modispacher testified that he never talked with the plaintiffs prior to the bankruptcy proceedings. (Trial testimony of Modispacher, Charles.)

Charles Modispacher stated that the $69,000,000 debt shown on the Canterbury Village Inc. voluntary bankruptcy petition was improperly attributed to Canterbury Village Inc. (Trial testimony of Modispacher, Charles.)

A figure of $69,000,000 in liabilities was not on the books of any of the four corporations. (Trial testimony of Modispacher, Charles.)

The bankruptcy petition showed land cost, however, Ernst & Young had no idea of the value of the land. (Trial testimony of Modispacher, Charles.)

Charles Modispacher testified that the bankruptcy schedule was inaccurate. (Trial testimony of Modispacher, Charles.)

Charles Modispacher stated that no one from Ernst & Young ever reviewed the books of Canterbury Village Inc., nor did they speak with Barbara L. Reilly and Thomas Reilly prior to the bankruptcy proceedings. (Trial testimony of Modispacher, Charles.)

Charles Modispacher stated that he was negligent in allowing false bankruptcy petitions to be filed and was indifferent to the affect on Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc., Managed Properties Inc. and the shareholders. (Trial testimony of Modispacher, Charles.)

As a result of the filing of the bankruptcy petition, Thomas and Barbara Reilly were deprived of the value of the real property that had a value of at least $68,000,000, as of May 20, 1992. (Deemed admission no. 36.)

Consequently, this court finds that the filing of an inaccurate bankruptcy petition by the defendant created substantial harm to the plaintiffs. Moreover, whereas the defendant knew that the petitions were inaccurate and the failure to correct said petitions resulted in a readily foreseeable harm to the plaintiffs, this court holds that the third element of *Althaus* has been satisfied.

Additionally, *Althaus* requires that the courts consider the consequences of imposing a duty upon the actor. This court does not find that imposing a duty on the defendant in the present case places an unfair burden upon the defendant. Rather, the import of this duty is simply to ensure that the information the defendant is supplying is accurate and reliable. To this extent, the court cannot conceive of any reason to accept a lesser standard from the defendant. As intended beneficiaries of the defendant's services, the defendant owed a duty to the plaintiffs to provide reliable and accurate services. Further, this court holds that this duty places no additional burden on the defendant beyond its existing responsibility to provide reliable and accurate information. Therefore, imposing a duty on the defendant to provide reliable and accurate information to the plaintiffs in the instant mat-

ter should only serve to ensure the preservation of responsible accounting services.

Finally, the Pennsylvania Supreme Court in *Althaus* stated that before determining a defendant's duty in a particular matter, the courts of this Commonwealth should consider the overall public interest in imposing that duty. In this respect, whereas this court finds that accounting firms should be required to provide services that are to be trustworthy and reliable to the intended beneficiaries of their product, imposing a duty upon the defendant under these circumstances is certainly within the overall public interest. Certainly, recent events have exemplified the harm that can result from an accounting firm's failure to properly consider the interests of its intended beneficiaries. In this respect, the court does not think it is in the public interest to permit the defendant to escape liability for its actions in this matter. As this court stated *supra,* the plaintiffs were intended beneficiaries of the accounting services provided by the defendant, and the defendant had a duty to the plaintiffs to carry out their review of Canterbury Village Inc. with care and due diligence. Hence, imposing a duty upon the defendant in the present instance represents an overall public interest in ensuring the competence and trustworthiness of accounting firms in similar circumstances.

After application of the *Althaus* test, this court holds that the defendant did owe a duty to the plaintiffs in this matter. Specifically, this court finds after consideration of the above five (5) factors that the plaintiffs were intended beneficiaries of the defendant, imposing a duty upon the defendant would ensure more reliable and accurate accounting services, the harm the defendant caused the plaintiffs was substantial and foreseeable, the conse-

quences of imposing this duty would not unduly burden the defendant, and there is an overall public interest in encouraging the defendant to act in this nature. For these reasons, this court holds that the defendant did owe a duty to the plaintiffs in the present case.

In addition, this court next considers the appropriate standard of conduct to which the defendant must conform. Before reaching a conclusion on this matter, however, the court must first determine the nature of the services the defendant was contracted to perform for the plaintiffs. To this extent, the defendant asserts that they were hired to perform a compilation and therefore should be held to a significantly lesser standard than if they were hired to do an audit. Upon reviewing the evidence presented during trial, this court disagrees. According to paragraph 3 of the application for approval of employment of accountants:

"The debtors wish to employ the firm of Arthur Young & Company to perform all accounting services for the debtors which may be necessary, with the most immediate services being to assemble and review the debtors' books and records and to compile relevant financial information concerning the debtors—or the—file relevant information concerning the debtors for the purpose of preparing the debtors' statements of affairs and schedules of assets and liabilities." (Trial testimony of Mark Gallagher.)

After reading this section of the application for approval of employment, the plaintiffs' expert witness, Mark Gallagher, concluded that it represented a contract for services beyond a compilation. See trial testimony of Mark Gallagher, October 1, 2002, p.m., p. 10. Further, the trial testimony of Charles Modispacher indicates that the de-

fendant was hired to do more than a compilation. See trial testimony of Charles Modispacher, September 30, 2002, p. 88. Therefore, this court finds that the defendant was employed to do something more than a mere compilation and shall be held to a higher standard of conduct.

As such, this court holds that the defendant must conform to the standard(s) of conduct set forth in the American Institute of Certified Public Accountants professional standards. According to the testimony, these standards are used to provide guidance to professional accountants when carrying out their services. See trial testimony of Mark Gallagher, October 1, 2002, p.m., p. 17. The following are pertinent sections of the AICPA professional standards that this court applies to the conduct of the defendant in the present matter:

AICPA professional standards, ET section 102, Integrity and objectivity, states in pertinent part:

"In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent the facts or subordinate his or her judgment to others. A member shall be considered to have knowingly misrepresented facts in violation of Rule 102 [ET section 102.01] when he or she knowingly—

"(1) Makes or permits or directs another to make materially false and misleading entries in an entity's financial statements or records shall be considered to have knowingly misrepresented facts in violation of Rule 102 [ET section 102.01]; or

"(2) Fails to correct an entity's financial statements or records that are materially false and misleading when he or she has the authority to record an entry; or

"(3) Signs or permits or directs another to sign a document containing false and misleading information."

AICPA professional standards, ET section 501-4 states in pertinent part:

"A member shall be considered to have committed an act discreditable to the profession in violation of Rule 501 [ET section 501.01] when, by virtue of his negligence, such member—

"(1) Makes or permits or directs another to make, materially false and misleading entries in the financial statement or records of an entity; or

"(2) Fails to correct an entity's financial statements that are materially false and misleading when the member has the authority to record an entry; or

"(3) Signs or permits or directs another to sign a document containing materially false and misleading information."

AICPA professional standards, AU section 150, GAAS, states in pertinent part:

".02(3) Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."

AICPA professional standards, AU section 230, states in pertinent part:

".01 Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

".02 This standard requires the independent auditor to plan and perform his work with due professional care. Due professional care poses a responsibility upon each

professional within an independent auditor's organization to observe the standards of fieldwork and reporting.

".03 *Cooley on Torts,* a legal treatise, describes the obligations for due care as follows: every man who offers his services to another and is employed assumes the duty to exercise in the employment such skill as he possesses with reasonable care and diligence. In all these employments where peculiar skills is requisite, if one offers his services, he is understood as holding himself out to the public as possessing the degree of skill commonly possessed by others in the same employment, and if his pretensions are unfounded, he commits a species of fraud upon every man who employs him in reliance upon his public profession."

AICPA professional standards, AU section 230: Reasonable assurance (.10)

"The exercise of due professional care allows the auditor to obtain *reasonable assurance* that financial statements are free of material misstatements, whether caused by error or fraud."

AICPA professional standards, ET: section 56, article V

"The quest for excellence is the essence of due care. Due care requires a member to discharge his professional responsibility with competence and diligence. It imposes the obligation to perform professional services to the best of the member's ability with concern for the best interest of those for whom the services are performed and consistent with the professional responsibility to the public."

Accordingly, these are the standards by which this court will measure the conduct of the defendant and de-

termine if that conduct failed to properly conform to the established standards. Moreover, whereas this court has determined that the defendant owed a duty to the plaintiffs, and there exists a standard of conduct by which the defendant must conform its conduct, a failure to conform its conduct to this standard will result in the court finding a breach of duty by the defendant.

## 2. A Failure on the Part of the Defendant To Conform to That Duty, or a Breach Thereof

This court next considers the second element required by the Pennsylvania Supreme Court for a cause of action in negligence: failure on the part of the defendant to conform to that duty, or breach thereof. To determine if the defendant breached its duty, this court first looks at the testimony presented at trial. Applying those elements of the AICPA noted *supra,* this court finds that the defendant has violated several of these Rules of Professional Conduct. Specifically, the defendant, through its agent Charles Modispacher, testified that permitting the filing of false bankruptcy petitions is a violation of AICPA professional standards, ET section 102. See trial testimony of Charles Modispacher, September 30, 2002, p. 204. Further, this court finds that Charles Modispacher's failure to inspect the books of CVI and to complete a title search was a violation of AICPA AU section 150. Additionally, the testimony by Charles Modispacher demonstrated that his conduct was in violation of the AICPA Rule 501-4 to the extent that he permitted the filing of a false financial statement and failed to correct the false entries. See *id.* at p. 205. Moreover, Charles Modispacher testified that the signing of documents and the submission of bankruptcy petitions that he knew were

false was in violation of section 230 of the AICPA requiring that accountants exercise due professional care. See *id.* at p. 211. As such, this court holds that the testimony by Charles Modispacher proves, by a preponderance of the evidence, that the defendant breached its duty to the plaintiffs.

Additionally, the testimony by Mark Gallagher, an expert witness for the plaintiff, furthers this court's finding that the defendant violated the AICPA, thereby breaching its duty to the plaintiffs. During direct examination by the plaintiffs, Gallagher responded to numerous questions regarding the professional conduct standards for certified public accountants including the following:

"Q: Okay. I think it was, can you tell his honor whether the provisions of the AICPA's Code of Professional Conduct and/or the Statements on Standards for Accounting and Review Services prohibit in any way a certified public accounting professional from, instead of operating as an independent and objective accounting professional, doing as they are directed by a person employing them?

"A: An accountant is supposed to be objective and use integrity in their work. In a case where, if you had a case where you were directed to put down on a piece of paper, I believe at a minimum you should footnote that and say, this figure has been—we have been directed by a client to put in this figure, put a footnote there. We take no responsibility for this figure, and we were directed to use it and put it down. At that point the accountant has met his requirements.

"Q: Okay. And if an accountant fails to do that, does he or she or they violate their rules and their duties to,

among others, this group of people the bankruptcy contracts would be adversely affected?

"A: If they knew the number was wrong or took no steps to determine whether the number was accurate, then, yes I think they have.

"Q: Mr. Gallagher, did you review the testimony of Mr. Modispacher in this case in respect to the motion for substantive consolidation that was filed in the bankruptcy?

"A: Yes.

"Q: Can you tell the court whether the filing of this, or rather these four false petitions and the consolidation of the four corporations, as had been admitted by the defendants in those admissions we just read, also in your opinion caused the Reillys to lose their interest in the real property and Canterbury Village Inc.?

"A: Factually, the consolidation of the four corporations resulted in the Reillys losing their property. That's a fact." See trial testimony of Mark Gallagher, October 1, 2002, a.m., pp. 59-60.

Further, Gallagher testified that whether the defendant was hired by the plaintiffs to complete a compilation or an audit, they were nonetheless under an obligation to comply with the general auditing standards related to integrity, objectivity, and due care. See trial testimony of Mark Gallagher, October 1, 2002, p.m., pp. 17-18. Moreover, Gallagher testified that failure to correct false information on a bankruptcy petition is a violation of the AICPA Standards of Professional Conduct, Rule AU 230, Reasonable Assurance (.10). See *id.,* October 1, 2002, a.m., p. 38.

Therefore, this court holds that the defendant had a duty to conform to the standards of the AICPA. Further,

by the testimony of Charles Modispacher and Mark Gallagher, it is clear that the defendant did not adhere to these standards, thereby breaching this duty. For these reasons, this court holds that this failure on the part of the defendant to conform its conduct to this legal duty sufficiently satisfies the second element for a cause of action in negligence.

### 3. A Causal Connection Between the Defendant's Breach and the Resulting Injury

This court must next determine if the plaintiffs sufficiently proved the existence of a causal nexus between this breach of duty by the defendant and the resulting injury to the plaintiffs. After reviewing the defendant's deemed admissions and the trial testimony of the plaintiffs' expert, Mark Gallagher, this court finds that the plaintiffs have successfully established this connection.

To reach this decision, the court first considers deemed admission no. 36:

"As a result of the filing of the bankruptcy petition, Thomas Reilly and Barbara Reilly were deprived of the value of the real property that had a value of at least $68,000,000, as of May 20, 1992."

The defendant's deemed admission no. 36 acknowledges that the filing of the bankruptcy petition resulted in harm to the plaintiffs. Further, as discussed *supra,* the testimony of Charles Modispacher clearly indicates that he knew at the time of the filing that the information he supplied for preparation of the bankruptcy petition was false. Therefore, this court finds a clear connection between the breach of duty by the defendant in knowingly providing false information for the bankruptcy petition

and the filing of the petition that led to the deprivation of the plaintiffs' value of the real property.

Additionally, this court considers the testimony of the plaintiffs' expert, Mark Gallagher. According to Gallagher's trial testimony:

"Q: Mr. Gallagher, did you review the testimony of Mr. Modispacher in this case in respect to the motion for substantive consolidation that was filed in the bankruptcy?

"A: Yes.

"Q: Can you tell the court whether the filing of this, or rather these four false petitions and the consolidation of the four corporations, as had been admitted by the defendants in those admissions we just read, also in your opinion caused the Reillys to lose their interest in the real property and Canterbury Village Inc.?

"A: Factually, the consolidation of the four corporations resulted in the Reillys losing their property. That's a fact." See trial testimony of Mark Gallagher, October 1, 2002, a.m., pp. 58-60.

Accepting the testimony of Gallagher, this court concludes that the filing of these false petitions resulted in harm to the plaintiffs. Indeed, but for the defendant's actions, the plaintiffs would have suffered no harm.

As such, this court is convinced, by a preponderance of the evidence, that there is a causal connection between the defendant's breach of duty and the resulting harm to the plaintiffs. Both deemed admission no. 36 and the trial testimony of the plaintiffs' expert, Mark Gallagher, indicate that the filing of the false petitions was causally linked to the resulting harm to the plaintiffs. Hence, this court holds that the plaintiffs have sufficiently satisfied the third element of the *Atcovitz* test for negligence.

## 4. Actual Loss or Damage Suffered
## by the Complainant

Finally, this court considers damages. In this instance, the value of CVI has been admitted by defendant's deemed admission no. 33, stating:

"As of 1986, the real property owned by Canterbury Village Inc. had a value of not less than $68,000,000."

Further, defendant's deemed admission no. 36, respectively, states that as a result of the filing of the bankruptcy petition, the plaintiffs were deprived of a value of the real property of CVI of at least $68,000,000. This court accepts the value indicated in these two deemed admissions as the plaintiffs' damages. Therefore, whereas the defendant's deemed admission nos. 33 and 36, respectively, establish a value for the real property of CVI, this court finds that damages, as required by the *Atcovitz* test, have been established by a preponderance of the evidence.

For the above reasons, this court holds that the plaintiffs have sufficiently proven, by a preponderance of the evidence, that the defendant was negligent in the present matter. Specifically, this court holds that the defendant had a duty to the plaintiffs to conform to certain standards of conduct, and through its actions, breached that duty. Further, this court holds there exists a causal connection between the defendant's breach of duty and the harm incurred by the plaintiffs. And finally, the court holds that due to this breach of duty by the defendant, the plaintiffs suffered actual loss. As such, this court finds that the defendant is liable to the plaintiffs for negligence.

## B. *The Significance of Thomas Reilly's Prior Convictions*

Although this court holds that the defendant is liable to the plaintiffs for its negligence in the present matter, the court will next consider the significance of Thomas Reilly's prior convictions in assessing damages. Pennsylvania Rules of Evidence, Rule 609 states in pertinent part:

"Impeachment by evidence of conviction of a crime

"(a) General rule

"For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or nolo contendere, shall be admitted if it involved dishonesty or false statement."

Further, the courts of this Commonwealth have held that Rule 609 pertains to both criminal and civil trials. Applying this rule, the Superior Court of Pennsylvania held in *Carlson Mining Co. v. Titan Coal Co. Inc.,* 343 Pa. Super. 364, 368-69, 494 A.2d 1127, 1129 (1985), "As impeachment by prior convictions is a subset of character evidence generally, we see no reason under our cases why prior convictions may not be used in civil cases to impeach witness credibility." (footnote omitted) Therefore, there are certain convictions that this court may consider when discerning the trustworthiness of witnesses' testimony.

Moreover, the courts have held that in a non-jury trial, it is the responsibility of the trial court to assess the credibility of the witnesses and weigh the relevancy of the evidence. See *Lou Botti Construction v. Harbulak,* 760 A.2d 896 (Pa. Super. 2000). Additionally, the Superior

Court of Pennsylvania held in *Stokes v. Gary Barbera Enterprises Inc.,* 783 A.2d 296, 297 (Pa. Super. 2001), "[T]he court is free to choose to believe all, part, or none of the evidence presented." Thus, when presiding over a non-jury trial, credibility determinations are solely within the province of the trial court.

Accordingly, this court notes that the plaintiff, Thomas Reilly, has multiple convictions for tax and mail fraud. Whereas these are crimes involving dishonesty, Rule 609 of the Pennsylvania Rules of Evidence permits this court's consideration of them when determining the veracity of Thomas Reilly's trial testimony.

Specifically, this court finds that, in contrast to the trial testimony of Thomas Reilly, he was aware of the overselling of properties. Additionally, this court finds that this overselling led to the need for the hiring of the defendant. Therefore, after considering the testimony of Thomas Reilly, and based upon his prior instances of dishonesty, this court finds that he was directly involved in the overselling that eventuated in the need to employ the services of the defendant.

Although the crimes that Thomas Reilly was convicted of do not automatically preclude plaintiffs recovery, whereas this court holds that Thomas Reilly knew of the overselling that led to the need for the hiring of the defendant, this court cannot permit Thomas Reilly to benefit from his own wrongdoing. Addressing this matter, the Pennsylvania Superior Court in *Commonwealth v. Johnson,* 764 A.2d 1094,1099 (Pa. Super. 2000), held that in both civil and criminal matters, a person shall not benefit from their own wrongdoing. It is the application of this legal standard that prevents this court from awarding damages to Thomas Reilly. For this court to hold

otherwise might be to encourage an actor's wrongdoing in the hopes of later being rewarded for those same wrong acts. Hence, this court simply cannot in good conscience award damages to Thomas Reilly given the court's belief that it was his bad acts that led to need for the hiring of the defendant.

## C. *Legal Significance of Tenancy by the Entireties*

Further, the court considers the legal significance of the plaintiffs being 50 percent shareholders in CVI, as tenants by the entireties. The defendant asserts that where property is held by tenants by the entireties, each spouse is responsible for the actions of the other. Additionally, the defendant urges that there exists a general presumption, to be disturbed only when it can be established by a preponderance of the evidence, that one spouse acts on behalf of the other spouse. This court agrees with the defendant, however, the defendant fails to recognize that the presumption that one spouse acts on behalf of the other spouse applies only when, "the benefits of such action inure to both." See *J.R. Christ Construction Co. v. Olevsky,* 426 Pa. 343, 349, 232 A.2d 196, 199 (1967); *News Printing Company Inc. v. Roundy,* 409 Pa. Super. 64, 597 A.2d 662 (1991). In the present matter, this court was not convinced that the acts of Thomas Reilly in any way benefited the CVI property that the plaintiffs held as tenants by the entireties. Therefore, there exists no presumption upon the plaintiffs to establish by a preponderance of the evidence, that Barbara Reilly did not know of Thomas Reilly's involvement in the overselling.

However, even if this presumption was necessary, the court finds that Barbara Reilly was not aware of the

overselling. Although both parties agreed to not have Barbara Reilly testify at the trial, portions of her deposition testimony were read into evidence. According to her deposition testimony, Barbara Reilly was kept "out of the loop" when Earned Capital stopped selling investments and did not recall having any conversations regarding the bankruptcy of the four corporations. Moreover, there was no other indication that Barbara Reilly was in any way aware of the actions of Thomas Reilly.

Also, this court considers if Barbara Reilly can be held responsible for the torts of Thomas Reilly. As held by the Supreme Court of Pennsylvania in *Community Federal Savings and Loan Association v. Luckenbach,* 436 Pa. 472, 476, 261 A.2d 327, 329 (1970), "[I]t is well settled in this Commonwealth that a husband is not responsible for the tortious acts of his wife committed outside his presence and without his actual or implied consent." Therefore, where one spouse does not consent to the tort of another spouse, that spouse cannot be held responsible. Applying this decision to the instant matter, this court has found no credible evidence to suggest that Barbara Reilly knew anything about the activities of Thomas Reilly. Further, as noted earlier, both parties agreed to not call Barbara Reilly as a witness. Therefore, this court finds that Barbara Reilly did not consent to the actions of Thomas Reilly, and cannot be held responsible for any of his wrongdoings with respect to this matter.

As such, this court concludes that the defendant was indeed negligent in providing accounting services to the plaintiffs. Additionally, this court holds that Thomas Reilly, through his tortious activities, led to the need for

the hiring of the defendant. Further, had Thomas Reilly not acted in the manner that he did, there would have been no need to employ the defendant to review the plaintiffs' corporate records. Consequently, this court will not permit Thomas Reilly to recover damages from circumstances that originated from his own tortious activities.

Thomas Reilly's tortious activities, however, shall not completely absolve the defendant from responsibility for its negligence. The actions of Thomas Reilly may have led to the need to hire the defendant, but the actions of the defendant were negligent in their own right. Moreover, the actions by the defendant, through its agent, Charles Modispacher, were inexcusable and represent an affront to the accounting industry. Additionally, while Thomas Reilly's actions directly led to the need for the services of the defendant, this cannot excuse the defendant's intervening negligence. Hence, just as this court will not permit Thomas Reilly to benefit from tortious actions that led to the need for the services of the defendant, similarly, this court will not allow the defendant to escape liability for their clearly negligent actions. Therefore, this court holds that, whereas Barbara Reilly was unaware of the actions of Thomas Reilly, and whereas the preponderance of the evidence establishes the negligence of the defendant, the defendant will not owe damages for their negligent actions against Thomas Reilly, but will owe damages for their negligent actions against Barbara Reilly.

## CIVIL CONSPIRACY

This court next considers Counts III and IV of the plaintiffs' amended complaint. Counts III and IV of the plaintiffs' amended complaint are stated as follows:

Count III: Barbara Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—civil conspiracy

Count IV: Thomas Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—civil conspiracy

After reviewing the evidence presented before the court in this matter, this court holds that the plaintiffs have failed to establish that the defendant committed civil conspiracy. In reaching this decision, this court reviews the holding by the Superior Court of Pennsylvania in *McKeeman v. Corestates N.A.,* 751 A.2d 655,660 (Pa. Super. 2000). According to the *McKeeman* court, those elements necessary for a civil action for conspiracy are: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." Further, the courts of this Commonwealth have determined that in a civil action for conspiracy, the plaintiff must prove its claim by a preponderance of evidence and not beyond a reasonable doubt. See *Merchants' & Manufacturers' National Bank of Pittsburgh v. Tinker,* 158 Pa. 17, 27 A. 838 (1893).

Applying this test to the evidence presented before this court, the court holds that the plaintiffs have failed to prove that two or more persons acted with a common purpose to commit an unlawful act or purpose. Although presenting some evidence that Mr. Frank Gustine was acting with the defendant to defraud the plaintiffs of the CVI property, this court holds that this evidence falls far short of the required legal threshold of a preponderance of the evidence. Thus, this court does not find the defendant liable for civil conspiracy against the plaintiffs.

## FRAUDULENT MISREPRESENTATION

Finally, this court considers the plaintiffs' claims of fraudulent misrepresentation contained in Counts V and VI. Counts V and VI are stated in the plaintiffs' amended complaint as follows:

Count V: Barbara Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—fraudulent misrepresentation

Count VI: Thomas Reilly v. Ernst & Young LLP successor to Arthur Young and Company, and Charles Modispacher—fraudulent misrepresentation

First, the court must examine those elements necessary to successfully establish a cause of action in fraudulent misrepresentation. Addressing this matter, the Pennsylvania Supreme Court in *Bortz v. Noon,* 556 Pa. 489, 498, 729 A.2d 555, 560 (1999), enumerated those elements necessary for a successful claim in fraudulent misrepresentation. These essential elements for fraudulent misrepresentation are as follows:

"(1) A representation;

"(2) which is material to the transaction at hand;

"(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

"(4) with the intent of misleading another into relying on it;

"(5) justifiable reliance on the misrepresentation; and,

"(6) the resulting injury was proximately caused by the reliance."

Further, the courts have held that a trial court shall employ a standard of clear and convincing when assessing the evidence in a claim for fraudulent misrepresenta-

tion. See *Skurnowicz v. Lucci,* 798 A.2d 788, 793 (Pa. Super. 2002).

Applying these standards to the circumstances of the present matter, this court holds that the defendant is liable to the plaintiffs for fraudulent misrepresentation. Specifically, the trial testimony of Charles Modispacher indicates that he supplied financial information for the preparation of bankruptcy petitions. The court finds relevant evidence with respect to this element of the *Bortz* test for fraudulent misrepresentation is as follows:

Charles Modispacher stated that Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc., and Managed Properties Inc. were his clients. (Trial testimony of Modispacher, Charles.)

Ernst & Young took control of the records of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Trial testimony of Modispacher, Charles.)

Charles Modispacher indicated that Ernst & Young did more than a compilation of the records of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Corporation Inc. and Managed Properties Inc. (Trial testimony of Modispacher, Charles.)

Ernst & Young gave opinions regarding the financial statements of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc., Managed Properties Inc. and testimony in the bankruptcy court. (Trial testimony of Modispacher, Charles.)

Ernst & Young gave information to attorneys to prepare the bankruptcy petitions. (Trial testimony of Modispacher, Charles.)

The defendant was responsible for filing a bankruptcy petition in the matter of the solvency of Canterbury Village Inc. and Eastern Arabians Inc. (Deemed admission no. 1.)

Additionally, this court finds that the plaintiffs have established, by clear and convincing evidence, that the information was material to the filing of the bankruptcy petition. The evidence presented during the trial leads this court to the conclusion that:

The defendant, Ernst & Young, successor to Arthur Young & Company, performed accounting services for the corporation, Canterbury Village Inc. (Trial testimony of Modispacher, Charles.)

Ernst & Young began their work for Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. in May 1986. (Trial testimony of Modispacher, Charles.)

From May 14, 1986 to June 3, 1986, there was an understanding between Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc., Managed Properties Inc. and the defendant regarding their responsibilities and functions. (Trial testimony of Modispacher, Charles.)

After June 3, 1986, the bankruptcy court directed the work of the defendant regarding Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Trial testimony of Modispacher, Charles.)

Ernst & Young took control of the records of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Trial testimony of Modispacher, Charles.)

Ernst & Young gave opinions regarding the financial statements of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc., Managed Properties Inc. and testimony in the bankruptcy court. (Trial testimony of Modispacher, Charles.)

Ernst & Young gave information to attorneys to prepare the bankruptcy petitions. (Trial testimony of Modispacher, Charles.)

A consolidated bankruptcy petition for Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. was filed. (Trial testimony of Modispacher, Charles.)

Further, the evidence presented before this court demonstrates that at the time of the filing of the bankruptcy petitions, the defendant, through its agent, Charles Modispacher, knew that the information contained in these petitions was false.

Charles Modispacher testified that he never talked with the plaintiffs prior to the bankruptcy proceedings. (Trial testimony of Modispacher, Charles.)

Charles Modispacher failed to do a title search of these properties. (Trial testimony of Modispacher, Charles.)

Charles Modispacher stated that no one from Ernst & Young ever reviewed the books of Canterbury Village Inc., nor did they speak with Barbara L. Reilly and Thomas Reilly prior to the bankruptcy proceedings. (Trial testimony of Modispacher, Charles.)

Charles Modispacher stated that the $69,000,000 debt shown on the Canterbury Village Inc. voluntary bankruptcy petition was improperly attributed to Canterbury Village Inc. (Trial testimony of Modispacher, Charles.)

A figure of $69,000,000 in liabilities was not on the books of any of the four corporations. (Trial testimony of Modispacher, Charles.)

Charles Modispacher testified that the bankruptcy schedule was inaccurate. (Trial testimony of Modispacher, Charles.)

Charles Modispacher read the bankruptcy petition but did not focus on the petition. (Trial testimony of Modispacher, Charles.)

Charles Modispacher knew that the bankruptcy petition was false on June 3, 1986, and did not tell Mr. Gustine that the information was false. (Trial testimony of Modispacher, Charles.)

Moreover, Charles Modispacher stated that, although knowing that these petitions were false, he did nothing to correct the false information that was relied upon by the plaintiffs.

Charles Modispacher testified that the bankruptcy schedule was inaccurate. (Trial testimony of Modispacher, Charles.)

Charles Modispacher read the bankruptcy petition but did not focus on the petition. (Trial testimony of Modispacher, Charles.)

Charles Modispacher knew that the bankruptcy petition was false on June 3, 1986 and did not tell Mr. Gustine that the information was false. (Trial testimony of Modispacher, Charles.)

Regarding Earned Capital Corporation Inc., Ernst & Young did not determine if the liability showing on the bankruptcy petition was debt or equity. (Trial testimony of Modispacher, Charles.)

A consolidated bankruptcy petition for Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. was filed. (Trial testimony of Modispacher, Charles.)

The bankruptcy petition showed land cost, however, Ernst & Young had no idea of the value of the land. (Trial testimony of Modispacher, Charles.)

Consequently, this court holds that the following evidence establishes, by a standard that is clear and convincing, that the plaintiffs and the bankruptcy court relied upon these petitions for their accuracy when determining the financial condition of CVI:

After June 3, 1986, the bankruptcy court directed the work of the defendant regarding Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Trial testimony of Modispacher, Charles.)

Ernst & Young gave opinions regarding the financial statements of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc., Managed Properties Inc. and testimony in the bankruptcy court. (Trial testimony of Modispacher, Charles.)

Thomas and Barbara Reilly relied upon Ernst & Young to do an accurate and correct assessment of the assets and liabilities of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corporation Inc. and Managed Properties Inc. (Testimony of Reilly, T.)

Thomas and Barbara Reilly believed that Ernst & Young would truthfully file any necessary bankruptcy petitions and determine the solvency of Canterbury Village Inc., Eastern Arabians Inc., Earned Capital Corpo-

ration Inc. and Managed Properties Inc. (Testimony of Reilly, T.)

Finally, as a result of this reliance by the plaintiffs on the defendant, the plaintiffs were deprived their 50 percent of the CVI real property valued at $68,000,000. Evidence relevant to this finding includes:

Charles Modispacher stated that the $69,000,000 debt shown on the Canterbury Village Inc. voluntary bankruptcy petition was improperly attributed to Canterbury Village Inc. (Trial testimony of Modispacher, Charles.)

A figure of $69,000,000 in liabilities was not on the books of any of the four corporations. (Trial testimony of Modispacher, Charles.)

Charles Modispacher testified that the bankruptcy schedule was inaccurate. (Trial testimony of Modispacher, Charles.)

The filing of the false bankruptcy petitions led to the Reillys losing their real property and CVI. (Trial testimony of Mark Gallagher.)

As a result of the bankruptcy petition filed, Canterbury Village Inc., was deprived of all of the assets that it owned prior to the commencement of the bankruptcy including one-half of the real property that later was owned by Seven Fields Development Corporation. (Deemed admission no. 34.)

As a result of the filing of the bankruptcy petition, Thomas and Barbara Reilly were deprived of the value of the real property that had a value of at least $68,000,000, as of May 20, 1992. (Deemed admission no. 36.)

For the above reasons, this court holds that the plaintiffs have, by clear and convincing evidence, satisfied

the test for fraudulent misrepresentation stated by the Pennsylvania Supreme Court in *Bortz.* Therefore, this court holds that the defendant is liable to the plaintiffs for fraudulent misrepresentation.

## DAMAGES

### *(Compensatory)*

For the reasons stated *supra,* when considering damages, this court will not permit Thomas Reilly to benefit from his own wrongful actions. Therefore, while this court finds the defendant liable to both plaintiffs, damages will only be awarded in favor of Barbara Reilly.

This court next focuses its attention on damages due the plaintiffs in this matter. As stated in deemed admission no. 33, as of 1986, the real property of CVI had a value of $68,000,000. Further, deemed admission no. 36 states that as a result of the filing of the bankruptcy petition, the plaintiffs were deprived of a value of the real property of CVI of at least $68,000,000. Whereas it has been established that the plaintiffs were 50 percent shareholders in CVI as tenants by the entireties, and the defendant has been found liable for negligence and fraudulent misrepresentation, this court awards the following in compensatory damages to the plaintiffs:

Court determined value of the CVI property at the time of the negligent and fraudulent actions of the defendant: $68,000,000

As 50 percent shareholders of CVI, plaintiffs' interest in the real property of CVI: $34,000,000

The plaintiff's, Barbara Reilly, interest in the real property of CVI as a tenant by the entirety: $34,000,000

Accrued interest on $34,000,000 at a rate of 6 percent beginning in 1986 and ending 2002: $50,945,222

Total court award in compensatory damages due the plaintiff, Barbara Reilly: $84,018,989

*(Punitive)*

Further, this court must consider punitive damages in this matter. Addressing the issue of punitive damages, the courts have held that punitive damages are properly awarded by a court to punish defendants for outrageous conduct and act as a deterrence to others from engaging in similar conduct. *Judge Tech. v. Clancy,* 813 A.2d 879, 888 (Pa. Super 2002). Further, the court stated:

"The standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant .... Moreover, in Pennsylvania, punitive damages are awarded for outrageous conduct, that is, for acts done with a bad motive or with a *reckless indifference* to the interest of others." See *id.* at 889. (citations omitted) (emphasis in original)

Applying this standard to the circumstances of the present case, this court holds that the actions of the defendant were in fact outrageous. Specifically, the testimony by the defendant's agent, Charles Modispacher, clearly indicates that he negligently compiled the records for CVI that were used for the creation of the bankruptcy petition. Further, Charles Modispacher testified that he never did a title search of the Seven Fields properties and that he never reviewed the books of Canterbury Village Inc. Moreover, Charles Modispacher admitted that

the bankruptcy schedule was inaccurate, that he knew that the figures contained on the bankruptcy petition were false, and that although knowing the figures to be false, did nothing to correct the error. Indeed, he permitted these false figures to be used in United States Bankruptcy Court.

Additionally, the court, when addressing punitive damages, must review the nature and extent of the harm caused by the defendant's outrageous conduct. In this case, the defendant deprived the plaintiffs of their interest in the real property value of CVI. As admitted by the defendant, the value of the property in 1986, at the time of the hiring of the defendant, was at least $68,000,000. Therefore, the plaintiffs' share of the CVI property was $34,000,000. Consequently, this court finds that the extent of the harm created by the defendant in the present instance was indeed severe.

Finally, this court considers the wealth of the defendant. Although a source of great controversy in this case, the court is satisfied, for the purposes of assessing punitive damages, with defendant net worth being $374,000,000. See trial testimony of James F. Hart, October 3, 2002, a.m., p. 62. As such, the court will use this figure, as supplied under oath by the defendant, to calculate the punitive damages.

Using these factors identified by the court in *Judge Tech.,* this court holds that punitive damages are appropriate in the present matter. Further, this court notes that the requirement when assessing punitive damages is to not violate the due process of a defendant. To aid in the determination of a constitutionally sound punitive damages award, this court reviews the recent decision by the United States Supreme Court in *State Farm Mutual Auto-*

*mobile v. Campbell,* 123 S.Ct. 1513 (2003). According to the Supreme Court, it should be assumed that compensatory damages have made a plaintiff whole, unless the defendant's actions are so reprehensible as to warrant additional sanctions. See *id.* at 1521. As noted *supra,* this court finds that the actions by the defendant do in fact warrant additional sanctions, and therefore deem punitive damages in this instance appropriate.

The United States Supreme Court in *State Farm* continued by holding, "few awards exceeding a single digit ration between punitive damages and compensatory damages, to a significant degree, will satisfy due process." See *id.* at 1524. Additionally, the Supreme Court held that there are no exact standards by which to assess punitive damages, and that the specific circumstances of each case deserve individualized attention. See *id.*

Applying these rulings to the present matter, this court holds that an award of $18,700,000 in punitive damages is an appropriate sanction for the negligent and fraudulent actions by this defendant. Further, given the severe harm done to the plaintiffs and the testified wealth of the defendant, this court holds that this assessment of 5 percent of the defendant's net worth represents an appropriate penalty and does not violate the defendant's constitutional protection of due process.

## CONCLUSIONS OF LAW

(1) The evidence proves, by a preponderance, that the defendant was negligent in the present matter.

(2) Privity is not required to maintain a negligence action by these plaintiffs against this defendant.

(3) This defendant had a duty to these plaintiffs to conform its conduct to appropriate standards.

(4) Social utility is not disfavored by the imposition of this duty upon the defendant.

(5) The filing of an inaccurate/false bankruptcy petition by the defendant created a substantial harm to the plaintiffs.

(6) This substantial harm was/should have been readily foreseeable by the defendant.

(7) The imposition of this duty upon the defendant does not represent an unfair burden.

(8) It is not in the public interest to permit the defendant to escape liability in the present matter.

(9) The defendant provided services to the plaintiffs that were something greater than a compilation.

(10) The defendant must conform its actions to the standards set forth in the American Institute of Certified Public Accountants professional standards.

(11) The defendant violated AICPA professional standards, ET section 102.

(12) The defendant violated AICPA professional standards, AU section 150.

(13) The defendant violated AICPA professional standards, ET section 501-4.

(14) The defendant violated AICPA professional standards, AU section 230.

(15) Whether the defendant was hired by the plaintiffs to complete a compilation or an audit, they were nonetheless under an obligation to comply with the generally accepted auditing standards related to integrity, objectivity, and due care.

(16) The failure to correct false information on a bankruptcy petition is a violation of the AICPA Standards of

Professional Conduct, Rule AU 230, reasonable assurance (.10).

(17) There is a causal connection between the defendant's breach of duty and the resulting harm to the plaintiffs.

(18) The plaintiffs were deprived of a value of the real property of CVI of at least $68,000,000.

(19) Given Thomas Reilly's evasiveness on the stand and his criminal record that includes mail fraud and false income tax reports, his testimony lacked credibility.

(20) Thomas Reilly's own actions led to the plaintiffs' need to employ the defendant in the present matter.

(21) Thomas Reilly knew of the overselling of the Seven Fields property and therefore the court cannot award damages resulting from the defendant's action.

(22) There exists no presumption upon the plaintiff to establish by a preponderance of the evidence that Barbara Reilly did not know of Thomas Reilly's involvement in the overselling.

(23) There was no other indication that Barbara Reilly was in any way aware of the actions of Thomas Reilly.

(24) Barbara Reilly did not consent to the actions of Thomas Reilly, and cannot be held responsible for any of his actions with respect to this matter.

(25) Barbara Reilly was kept "out of the loop" when Earned Capital stopped selling investments and did not recall having any conversations regarding the bankruptcy.

(26) A wife is not responsible for the tortious acts of her husband when committed outside her presence and without her actual or implied consent.

(27) Barbara Reilly did not consent to the actions of Thomas Reilly, and cannot be held responsible for any of his wrongdoings with respect to this matter.

(28) Whereas Barbara Reilly was unaware of the actions of Thomas Reilly, and whereas the preponderance of the evidence establishes the negligence of the defendant, the defendant will not owe damages for their negligent actions against Thomas Reilly, but will owe damages for their negligent actions against Barbara Reilly.

(29) The evidence falls far short of the required legal threshold of a preponderance of the evidence and therefore the defendant is not liable for civil conspiracy against the plaintiffs.

(30) The defendant supplied financial information for the preparation of bankruptcy petitions.

(31) This information was material to the filing of the bankruptcy petition.

(32) At the time of the filing of the bankruptcy petitions, the defendant knew that the information contained in these petitions was false.

(33) Although knowing that these petitions were false, the defendant did nothing to correct the false information that was relied upon by the plaintiffs.

(34) The plaintiffs and the bankruptcy court relied upon these petitions for their accuracy when determining the financial condition of CVI.

(35) As a result of this reliance by the plaintiffs on the defendant, the plaintiffs were deprived their 50 percent of the CVI real property valued at $68,000,000.

(36) The defendant is liable to the plaintiffs for fraudulent misrepresentation.

(37) The total court award in compensatory damages due the plaintiff, Barbara Reilly, is $84,018,989.

(38) The actions of the defendant in this matter were outrageous and therefore permit the awarding of punitive damages.

(39) The assessment of 5 percent of the defendant's net worth, stated under oath to be $374,000,000, represents an appropriate penalty and does not violate the defendant's constitutional protection of due process.

(40) The punitive damages awarded by the court to plaintiff, Barbara Reilly, in this matter is $18,700,000.

(41) The total amount of damages due the plaintiff, Barbara L. Reilly, by the defendant, Ernst & Young LLP, is $102,718,989.

## VERDICT

And now, November 19, 2003, following the non-jury trial in the above-captioned matter and in accordance with the foregoing findings of fact, conclusions of law and memorandum opinion, judgment is entered in favor of the plaintiff, Barbara L. Reilly, only, as follows:

Against the defendant, Ernst & Young LLP, successor to Arthur Young & Company, in the amount of $102,718,989.